855 P.2d 1351

**Mary CURRIER dba Verde Valley Transit Authority; Mary "Mimi" Currier and Lewis J. Currier, husband and wife, Plaintiffs/Appellants,**

v.

**WESTERN NEWSPAPERS, INC.; The Independent; Dick Smith; and Dan Engler, Defendants/Appellees.**

No. CV–91–0326–PR.

Supreme Court of Arizona.

July 20, 1993.

Brown & Bain by Daniel C. Barr, Bennett E. Cooper, Phoenix, for defendants, appellees.

Gail Gianasi Natale, Marton & Hall, P.A. by Kraig J. Marton, Phoenix, for plaintiffs, appellants.

## OPINION

ZLAKET, Justice.

Plaintiffs in this libel action seek review of a court of appeals memorandum decision affirming summary judgment in favor of defendants. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24. We reverse and remand.

### FACTS AND PROCEDURAL BACKGROUND

Plaintiffs Currier sued columnist Richard Brady and his employer, *The Independent,* a newspaper circulated in the Verde Valley. Additional defendants were the newspaper's editor, Dan Engler, and publisher, Dick Smith, as well as its parent company, Western Newspapers, Inc. (WNI).

Mary Currier was the founder and director of the Verde Valley Transit Authority (VVTA), a bus system serving the Jerome/Cottonwood area. She arranged public and private funding for the company, and obtained all of its operational certificates and licenses. The VVTA formally came into existence in July 1980, and buses began running in October 1983. The company ceased operations in October 1986.

Lewis Currier, Mary's husband, served as the Jerome town clerk from June 1981 to July 1983. Although his primary duties included the day-to-day operation of the municipal government, he also functioned as the town's general manager, chief financial officer, and records custodian. During Mr. Currier's tenure as clerk, the town conducted several transactions with the VVTA. The Curriers maintain that in these matters they attempted to deal with each other on a strictly formal, arms-length basis.

On February 26, 1986, *The Independent* published an unsigned editorial, written by Brady, characterizing the VVTA as a "money-sucking vacuum." In a letter to the editor, published on March 5, Mary Currier asserted that the editorial contained factual errors.

In the same March 5 edition, Brady's regular column expressed his intention to pursue the transit authority "like a hound smelling blood." He promised to "cover that entity like Los Angeles smog." He also advised his readers that he was "fundamentally opposed to the philosophy that created such public monsters and totally opposed to the actual makeup of the authority itself." Finally, he warned:

> Transit authorities in the 21st century will probably be as common as bison were in 1890. And there will be a lot of reputations to be made in the interim, a lot of Great Right Hunters to be proclaimed in the next 14 years.
>
> In the meantime, there is a lot of data to collect on the authority.
>
> The time has come to begin.

In a letter published in *The Independent* on March 19, 1986, a former news editor of the paper charged that Brady's column reflected a personal motive to destroy the VVTA, and was unethical by professional journalistic standards.

On April 2, 1986, Brady wrote a column entitled "The 'Jerome Comedy Hour,' " in which he satirized the town and its government. The Curriers were targeted in the column, as follows:

> I've got an idea that I'm sure could be sold to one of the networks as a hit soap opera.
>
> .    .    .    .    .
>
> In my soap opera, of course, I would have [the current town manager] re-

placed by someone like Mary or Lew Currier. Lew, as the good people of Jerome remember, was the town clerk who allowed town property to be used as collateral on a loan taken out by his wife.

Lewis Currier wrote a letter dated April 3, 1986 to Defendant Smith, pointing out "several errors of fact [in the April 2 column] which should be corrected." He noted that all buses (the town property he assumed Brady was talking about) were purchased with funds provided by the state and Mary Currier, and that the town had acquired title to those buses at no expense, subject to liens already in place. He also stated that the clerk had no power to "allow" town property to be used as Brady claimed, and in any case, that he was not even in office when these transactions were approved.

On April 9, 1986, Brady responded in his regular column to Mr. Currier's letter:

In my *Ramblings* column last Wednesday I erroneously stated Lew Currier was the Jerome town clerk who allowed town property to be used on a loan taken out by his wife, Mary Currier, director of the Verde Valley Transit Authority. Lew objected to that sentence, since he was not town clerk when liens were placed on the town's buses for the loan taken out by his wife.

However, he was town clerk when the town and fledgling authority planned the bus service. His signature is on the agreement between Jerome and the authority earmarking town land to be leased for 10 years at $1 per year for the authority's office.

To his credit, Currier resigned as town clerk a few months after an audit suggested the relationship between the two Curriers—as town clerk and authority director—"could become a problem if transactions are handled on an informal basis ..." and "if the town clerk is responsible for both creation and payment of an obligation, including preparation of the Town Council meeting minutes approving payment of the obligation." The audit was conducted before the first federal transportation grant was awarded to the town.

On April 14, 1986, counsel for the Curriers sent a letter to *The Independent* demanding that "truthful corrections be published." The newspaper claims it printed a correction stating that the VVTA paid the town $15 per month for office space and $1 per year for buses and equipment. This retraction is not in the record before us, but our decision does not turn on its existence.

The Curriers filed suit alleging that the April 2 and April 9 columns were libelous. The trial court granted a defense motion for summary judgment as to the April 2 column because the claim was time-barred. It also dismissed defendant Brady from the suit since he had not been served within one year from the filing of the complaint. *See* former Ariz.R.Civ.P. 6(f), 16 A.R.S. The court then granted summary judgment on the merits in favor of the newspaper, its editor, and the parent company for the claim based on the April 9 column. The publisher, Mr. Smith, had apparently not been served. Thus, the action was concluded in the trial court. The court of appeals affirmed in a memorandum decision. We granted the petition for review, which concerns only the April 9 column.

## DISCUSSION

■ The First Amendment recognizes that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 (1964). *See also* Ariz. Const. art. 2, § 6. In furtherance of such spirited debate, the law provides that public officials may recover damages for defamation only if they prove "actual malice," that is, "knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–280, 84 S.Ct. at 726, 11 L.Ed.2d at 706. "Public figures" bear the same burden and, like public officials, must prove actual malice by clear and convincing

evidence. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 659, 109 S.Ct. 2678, 2681, 105 L.Ed.2d 562, 571 (1989). Plaintiffs here concede that they are public figures.

In the April 9 column, Brady wrote that Lewis Currier's "signature is on the agreement between Jerome and the authority earmarking town land to be leased for ten years at $1 per year for the authority's office." Defendants admit there was no such agreement. They claim, however, that the statement is "substantially true" and, therefore, not actionable. *See Read v. Phoenix Newspapers Inc.,* 169 Ariz. 353, 355, 819 P.2d 939, 941 (1991). Although Lewis Currier's signature was not on an actual agreement for the lease of land, they argue, it was on a letter requesting the town attorney to draw up a lease between the VVTA and the municipality for the use of two buses, one fuel tank and miscellaneous equipment, at a cost to the VVTA of $1 per year for ten years.

■ The defense of substantial truth recognizes that "slight inaccuracies of expression are immaterial" if the alleged defamatory statement is "true in substance." Restatement (Second) of Torts § 581(A), comment f (1977). A technically false statement may nonetheless be considered substantially true if, viewed "through the eyes of the average reader," it differs from the truth "only in insignificant details." *Zerangue v. TSP Newspapers, Inc.,* 814 F.2d 1066, 1073 (5th Cir.1987). Brady's April 9 statement, however, was more than slightly inaccurate. It was flat wrong.

■ The gist of the published charge was that Lewis Currier, acting in his official capacity as town clerk, bound the municipality and its citizens to a highly unfavorable contract—a "sweetheart deal" in the words of the dissent—which resulted in an economic benefit to his wife. The record shows, however, that it was not Currier, but the Vice–Mayor of Jerome who signed the equipment lease. In fact, Currier scrupulously avoided becoming involved in the transaction. His letter to the town attorney, upon which the dissent relies in arguing "substantial truth," illustrates the point well:

> Apparently all the funding for the VVTA has been arranged and we are about to sign contracts on the project. Before we do, however, one more document is needed: a lease between the Town and the VVTA for the use of the equipment.... Because of my relation with Mimi we feel it would be better to have you draw up the lease, if possible.
>
> We have worked out some parameters for this lease.... You might add any clauses you think appropriate.

The record contains evidence to suggest that in requesting the attorney to draw up this equipment lease, Currier was simply carrying out the wishes of a town council that had, even prior to his employment, made plans with his wife for the creation and implementation of the transit authority, leased it an office, and thereafter hired him with full and complete knowledge of her continuing role in the company. We therefore cannot say that as a matter of law Brady's statement was "true in substance," or that the average reader would view the difference between it and the truth as nothing more than an "insignificant detail."

■ Defendants next argue that the evidence fails to demonstrate either knowledge that the statement was false or reckless disregard of its truth. In reviewing this summary judgment, we must determine whether there are genuine issues of material fact which, if resolved in favor of plaintiffs, would permit a jury to determine by clear and convincing evidence that defendants knew the falsity of what was published or entertained serious doubts as to its truth. *See Dombey v. Phoenix Newspapers, Inc.,* 150 Ariz. 476, 486–87, 724 P.2d 562, 572–73 (1986) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202, 216 (1986) and *St. Amant v. Thompson,* 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262, 267 (1968)); *see also Masson v. New Yorker Magazine, Inc.* 960 F.2d 896, 900 (9th Cir.1992) (recklessness may be found when obvious reasons to

doubt the truth of a statement are ignored). Not surprisingly, the record contains no direct evidence of these states of mind. Public figures must invariably rely on circumstantial evidence to prove actual malice. *Dombey*, 150 Ariz. at 488, 724 P.2d at 574.

We believe the evidence here is sufficient to create a jury question. The March 5 column, in which Brady stated his intention to pursue the VVTA, arguably evinces ill will toward the transit authority and the Curriers. *See Starkins v. Bateman*, 150 Ariz. 537, 548, 724 P.2d 1206, 1217 (Ct.App. 1986) (ill will may be circumstantial evidence of actual malice). A jury could find, based on that column and the letter to the editor following it, that Brady intended to build his reputation as a journalist by destroying the VVTA. *See Harte–Hanks*, 491 U.S. at 667–68, 109 S.Ct. at 2686, 105 L.Ed.2d at 577 (evidence concerning motive is relevant to actual malice).

The record also contains evidence of negligence, as well as breaches of journalistic standards. *See Dombey*, 150 Ariz. at 487, 724 P.2d at 573 (failure to investigate is one factor in determining actual malice); *Harte–Hanks*, 491 U.S. at 667–68, 109 S.Ct. at 2686, 105 L.Ed.2d at 577 (departure from professional standards is relevant to actual malice). Brady's statement demonstrates that he either did not look at the public records at all, or was careless in reading and recording what he saw. Furthermore, the letter from a former newspaper editor raised questions of Brady's motives and professionalism in pursuing the transit company.

Finally, defendants apparently ignored warnings about inaccuracies before the April 9 column was printed. Both Mary Currier's March 5 letter and Lewis Currier's April 3 letter pointed out errors in prior columns. Brady repeated one of those errors in the April 9 column by writing "liens were placed on the town's buses for the loan taken out by [Mary Currier]" even after Lewis Currier had advised the paper that the buses were already subject to liens when the town acquired them. *See Dombey*, 150 Ariz. at 489, 724 P.2d at 575

(request for retraction coupled with specific facts to rebut inaccuracy, if ignored, may indicate actual malice).

■ Defendants argue that Brady's uncontroverted affidavit shows he entertained no doubts about the truth of the statement, and therefore did not act with actual malice. *See Dombey*, 150 Ariz. at 487, 724 P.2d at 573 (proof of "reckless disregard" requires *"sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication "*) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262, 267 (1968) (emphasis supplied in *Dombey* )). The affidavit states:

> To correct and clarify the errors in the April 2, 1986 column, I reviewed public documents concerning the VVTA at the Jerome Town Clerk's office. During my review of the VVTA documents, *I believe I saw Lewis Currier's signature on an agreement* between Jerome and the VVTA earmarking town land to be leased for 10 years at $1.00 per year for the authority's office.

(Emphasis added.) Plaintiffs did not, and likely cannot directly controvert Brady's bald declaration of subjective belief. Despite this, the affidavit is not determinative. Permitting the summary termination of a defamation action on the basis of a defendant's self-serving proclamation about what he thought was true would effectively emasculate the law as it applies to public figures. A defendant cannot halt the plaintiff's case by simply declaring that he or she acted without actual malice. *Selby v. Savard*, 134 Ariz. 222, 225, 655 P.2d 342, 345 (1982). Yet that is precisely what Brady attempts here to do. His affidavit obviously could not state that he saw Mr. Currier's signature on the agreement, because the signature never existed. Brady therefore did the next best thing, which was to claim honest mistake. That placed his credibility squarely in issue.

We do not mean to imply that the *mere possibility* a jury might disbelieve Brady creates a genuine issue of material fact. *See Bose Corp. v. Consumers Union*, 466

U.S. 485, 512, 104 S.Ct.1949, 1966, 80 L.Ed.2d 502, 524 (1984) ("discredited testimony is not considered a sufficient basis for drawing a contrary conclusion"). Some evidence of actual malice is needed. We conclude here that plaintiffs have shown enough to survive a summary judgment motion.

## CONCLUSION

Because a jury could find liability based on the false statement that Lewis Currier's signature was on the agreement in question, the trial court erred in granting summary judgment for the defendants. At this point, we need not review any other of the allegedly libelous statements. The court of appeals' order affirming summary judgment for defendants WNI, *The Independent*, and Engler is vacated. The judgment is reversed, and the case remanded to the trial court for further proceedings consistent with this opinion.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN, J.

MARTONE, Justice, dissenting.

The First Amendment is first, not because it has primacy over other amendments, but because freedom of speech is the sort of subject that would come up first in any discussion about what it means to live in a free society. The law of defamation has enjoyed an historical exception to the freedom guaranteed by the First Amendment, but it yields to the First Amendment when their interests diverge.

This is a case about a reporter interested in uncovering a potential public scandal. Like a local Pulitzer Prize winning cartoonist, the reporter does not aim to please, but just aims. The court believes that his aim this time crossed the line from protected speech to actionable defamation. Because I disagree, I dissent.

The court ultimately concludes that a jury could find liability based on the false statement that Lewis Currier's signature was on an agreement to lease town property for $1 per year, and, therefore, the trial court erred in granting summary judg-

ment. I disagree for two separate but related reasons.

### 1. *Substantial Truth*

The court bases its decision upon the following statement:

His signature is on the agreement between Jerome and the authority earmarking town land to be leased for 10 years at $1 per year for the authority's office.

In this, the reporter erred. His signature was not on an agreement but on a letter to the town attorney instructing him to draw up an equipment lease between his wife's business and the town. The terms of that lease were 10 years at $1 per year. Exhibit 25, appendix to petition for review. Thus, a literally accurate statement would have been as follows:

His signature is on the letter instructing the town attorney to draw up an agreement between Jerome and the authority for the use of equipment for 10 years at $1 per year.

The way in which the statement and the truth diverge is irrelevant to that which the reporter was communicating. That the agreement related to equipment rather than a leasehold was a distinction without a difference. And, as a matter of law, it does not matter whether the principal signed the document or instructed his agent to prepare it. If he was disqualified from signing it, he surely was disqualified from participating at all. He should have disqualified himself from any involvement and had someone else, the vice mayor perhaps, make decisions and instruct the lawyer to draw up an agreement. The reporter was communicating that the chief executive officer of the town had entered into a sweetheart deal between the town and his wife's business for a certain term at a certain price.

Under the Restatement (Second) of Torts § 581(A) cmt. f (1977), "[i]t is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance."

I believe that the slight inaccuracy identified is quite immaterial to that which the reporter sought to communicate, and that the defamatory charge here is true in substance. The substance of the charge was nepotism and inside dealing, not leaseholds versus equipment. For this reason alone, summary judgment was appropriately granted.

### 2. *The Clear and Convincing Evidence Standard*

Because it is undisputed that the Curriers were public figures, they must prove actual malice by clear and convincing evidence. In addition, because of the heightened standard, the judge in granting or denying summary judgment must use that heightened standard in evaluating the evidence. The court concedes that under *Dombey v. Phoenix Newspapers, Inc.*, 150 Ariz. 476, 724 P.2d 562 (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the question is whether any reasonable jury could find that the plaintiff has shown actual malice by clear and convincing evidence. Or, as we recently stated in *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990), the judge should grant summary judgment if on the state of the record he would have to grant a motion for directed verdict at the trial.

As stated in section one above, I am of the view that the alleged defamatory material was substantially true. That would have ended the inquiry. But suppose one believes, as does the majority here, that the substantial truth test has not been met? What is left of this case? Could any reasonable jury find by clear and convincing evidence that the defendant published with knowledge of falsity or reckless disregard of the truth because the agreement was for equipment rather than a leasehold? Does it matter? No judge would let such a case go to the jury. It is not likely that such a case would go to the jury even under the preponderance of the evidence standard. But, where, as here, in deciding whether the quantum of evidence is clear and convincing, the court must evaluate and weigh that evidence, "at least to some minimal extent," *Orme School, id.* at 308, 802 P.2d at 1007, it is hard to imagine a judge concluding that the heightened standard has been met on summary judgment. This is not a more probable than not standard. This is a "highly probable" standard. *State v. King*, 158 Ariz. 419, 422, 763 P.2d 239, 242 (1988). Under these circumstances, I am of the view that the relationship between the minimal divergence between the truth and the statement and the heightened standard of proof in libel cases requires that summary judgment be entered against the plaintiff. The trial judge thought so. Three members of the court of appeals thought so. I think so. For all these reasons, I dissent.