SUZUKI MOTOR CORPORATION and
American Suzuki Motor Corporation,
Plaintiff–Appellant,

v.

CONSUMERS UNION OF UNITED
STATES, INC., a non-profit New York
Corporation, Defendant–Appellee.

No. 00–56043.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed June 25, 2002.

Robert B. Fiske, Jr., Michael P. Carroll, William C. Komaroff, Davis Polk & Wardwell, New York, NY; George F. Ball, Law Offices of George F. Ball, P.C., Newport Beach, CA; Gene C. Schaerr, David J. Lewis, Paul J. Zidlicky, Michael S. Lee, Sidley Austin Brown & Wood, Washington, DC; James Harris, Sidley Austin Brown & Wood, Los Angeles, CA, for the plaintiff-appellant.

Barry G. West, Corey E. Klein, Sylvia M. Virsik, Gaims, Weil, West & Epstein, LLP, Los Angeles, CA, Joseph W. Cotchett, Frank Pitre, Cotchett, Pitre & Simon, Burlingame, CA, Michael N. Pollet, Pollet & Felleman, LLP, Yonkers, NY, for the defendant-appellee.

**1194**

John A. Clarke, Washington, D.C., for amicus curiae Accuracy in Media, Inc.; Kieran P. Fallon, Miami, Florida, for amici curiae Bill Seidle Suzuki, Bob Lewis Suzuki, David O'Neal Suzuki, Five Star Suzuki, Jim Hudson Suzuki, and Roger Beasley Suzuki; and Richard A. Samp, Washington, D.C., for amicus curiae Washington Legal Foundation, all seeking reversal.

Before: FERGUSON, TASHIMA, and GRABER, Circuit Judges.

Opinion by Judge TASHIMA; Dissent by Judge FERGUSON.

TASHIMA, Circuit Judge.

In 1988, Appellee Consumers Union of United States, Inc. (CU), published a story in its magazine *Consumer Reports,* in which it rated the Suzuki Samurai "Not Acceptable" based on its propensity to roll over during accident avoidance tests. Since that time, CU has publicly referred to the negative Samurai rating in various fora, most prominently in the 60th Anniversary issue of *Consumer Reports,* published in 1996. Appellant Suzuki Motor Corporation (Suzuki), the manufacturer of the Samurai, has challenged the validity of CU's Samurai test and, on the heels of the 60th Anniversary issue, brought this action against CU alleging product disparagement. CU's motion for summary judgment was granted by the district court, which held that a reasonable jury could not

conclude by clear and convincing evidence that CU had acted with actual malice. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

## I. BACKGROUND

CU is a nonprofit corporation that engages in comparative testing and evaluation of consumer products and services, the results of which are published in the magazine *Consumer Reports.* In order to provide buying and safety advice to automobile purchasers, CU's Automotive Testing Division (ATD) tests approximately 40 cars and other vehicles each year.

CU tested the Samurai in 1988.[1] The Samurai, a sport utility vehicle (SUV) manufactured by Suzuki, was introduced in the United States in 1985. By 1988, approximately 150,000 Samurais had been sold. Although it had received some favorable reviews from the automotive press, the Samurai had also been the subject of news stories that highlighted its instability and propensity to tip over. In February 1988, the Center for Auto Safety filed a petition with the National Highway Traffic Safety Administration (NHTSA) to open an investigation into an alleged safety defect of the Samurai. The petition was denied, although the NHTSA emphasized that the denial was not an endorsement of the safety performance of a vehicle.

### A. April 20, 1988: Long–Course Testing

On April 20, 1988, the ATD tested the Samurai, along with the Jeep Cherokee, Isuzu Trooper II, and Jeep Wrangler, on its standard long course, a double lane-change avoidance maneuver test course that CU had used since 1973.[2] The long

---

1. As Suzuki points out, around this time CU made a significant financial outlay in order to secure a new headquarters building in Yonkers, New York. This outlay of approximately $30 million placed CU in what the district court termed a "financially overextended" position.

2. The long-course maneuvers followed preliminary testing on the Samurai. CU notes that during the evaluation and break-in process, Alan Hanks, the Facilities Manager of the ATD, rolled the Samurai on a snow-covered gravel road at 15 miles per hour. During the formal test ride on April 7, 1988, CU driver Kevin Sheehan reported that the Sa-

course was designed to replicate an emergency situation in which a driver suddenly steers a vehicle left into the opposing lane, to avoid an obstacle, and quickly back into the original lane to avoid oncoming traffic. Several CU personnel were in attendance during the April 20 testing, including Robert Knoll, the head of the ATD, Dr. R. David Pittle, CU's Technical Director and Senior Vice–President, and Irwin Landau, the Editorial Director of *Consumer Reports,* who had been assigned as the initial writer and editor of the Samurai article. Pittle had invited Landau to attend the testing because he thought that they might witness a tip-up of the Samurai.

CU driver Kevin Sheehan drove the Samurai first, putting it through the long course 16 times at speeds reaching over 50 miles per hour. The Samurai that Sheehan drove was equipped with outriggers, which essentially act as training wheels to prevent the car from tipping over completely.[3] During Sheehan's runs, the Samurai did not tip over, prompting Sheehan to make the following evaluation of the car: "rubbery, slow response, rocks a bit, but never felt like it would tip over." In the Avoidance Maneuver Data Summary, Sheehan rated the Samurai as highly as or better than other vehicles tested that day.

After Sheehan had completed his testing, CU removed the outriggers. CU driver Rick Small then drove the Samurai through the long course 21 times at speeds similar to those achieved by Sheehan. Again, there were no tip-ups. In his driver log, Small stated: "steering is slow, but it works—responds well and corrects quickly, leans normally, snaps back. Confidence fairly high. No real problem." On

the basis of his test drives, Small rated the Samurai higher than the other three vehicles tested that day.

According to testimony by former CU employee Ron Denison, at some point during the long-course testing, which had not demonstrated any tip-ups of the Samurai, Landau told Sheehan: "If you can't find someone to roll this car, I will."

After Sheehan and Small had completed their test runs, Pittle, who was not a test driver, began to drive the Samurai through the long course. According to Pittle, he did so because he had never driven a small SUV and wanted to get a feel for how it handled through the course. Pittle took the car though the course 10 times, achieving a top speed of 49 miles per hour. On Pittle's tenth run, the Samurai tipped up on two wheels. Pittle stated that he did not purposefully cause the Samurai to tip up and that it was a startling and unexpected occurrence. When Pittle tipped the car, one onlooker yelled, "yeah!," while another shouted, "I think I got that, I think I got that."

### B.  April 26, 1988: Short–Course Testing

After the long-course testing, Knoll redesigned CU's avoidance course to replicate the situation that caused the Pittle tip-up. This new modified short course had a reduced distance for the first lane change, and the obstacle to be avoided was moved three feet to the left.

Sheehan, who was afraid to drive the Samurai through the short course, was replaced by CU driver Fred Wood. Wood, who drove the vehicle with outriggers,

---

murai was "by far the worst ride in my 20+ years at CU." Sheehan also took the Samurai on a one-day trip test on April 11, 1988, after which he noted that the Samurai should be rated "Not Acceptable." In addition, as Suzuki notes, preliminary research had been

conducted for the Samurai story prior to the initiation of long-course testing.

**3.**  Suzuki contends that the outriggers allowed CU to achieve dramatic results during the tests without risking a real rollover.

made 15 runs through the course. On the fifteenth run, the Samurai tipped up onto the outriggers. After this last run, Knoll is heard on the test videotape saying: "That's it. That looked pretty good." Knoll later acknowledged that he was "relieved" that the Samurai tipped up during short-course testing.

Small then drove the car through the short course. On his second run, the Samurai tipped up onto the outriggers at a speed of 40 miles per hour. After the tip-up occurred, CU technician Joseph Nappi can be heard on the test videotape saying, "[a]ll right Ricky baby."[4] That same day, CU also put the Jeep Wrangler and Isuzu Trooper II through the short course with no tip-ups reported.

### C.  May 12, 1988: Additional Short-Course Testing

Further testing was scheduled on the short course for May 12, 1988. The parties offer conflicting justifications for why this set of tests was necessary. Suzuki suggests that the additional testing was scheduled for the purpose of shooting video footage of the Samurai for a subsequent press conference, at which it had already been decided that CU would rate the Samurai "Not Acceptable." CU contends that the testing was held to evaluate the performance of the newly released 1988-½ Samurai, which included suspension modifications that distinguished it from the 1988 version tested previously.

Small was the first to drive the Samurai through the short course on this day, tipping over onto the outriggers on his fifth run. Following Small, Wood tipped the Samurai on his second run. Pittle was watching the test runs and, prior to witnessing a tip up, stated: "Can't you just see it, we get no lift off the ground. Oh God." CU also put a Jeep Wrangler, Jeep Cherokee, and Ford Festiva sedan through the short course on May 12. None of these vehicles tipped up.

### D.  June 2, 1988: Press Conference

CU held a press conference on June 2, 1988, at which it announced that the Samurai had shown a propensity to roll over in CU's tests and that it would be rated "Not Acceptable" in an article to appear in the July 1988 issue of *Consumer Reports*. During the press conference, Pittle stated that, based on CU's testing, the Samurai had an "unusually high propensity to roll over while performing an accident avoidance maneuver that could be demanded suddenly of any driver during routine driving." Pittle further described the short course as "benign," involving only "very limited steering inputs," a characterization he later conceded was "not accurate." Pittle also stated that the other tested vehicles had made it through the short course with a "yawn," a statement that Suzuki contends is at odds with the fact that the Isuzu Trooper II failed the course in three out of four runs by hitting cones.[5]

---

**4.**  Suzuki emphasizes CU's submission of what it characterizes as a "false" affidavit in connection with Nappi's statement. CU employees Hanks, Sheehan, Wood, Nappi, and Knoll submitted an affidavit stating that it was Denison, not Nappi, who could be heard on the videotape saying "All right, Ricky baby" after Small tipped the Samurai on April 26, 1988. Nappi later admitted, however, that he in fact made the statement. Suzuki suggests that the affidavit was submitted in an effort to discredit Denison, who had testified that Landau threatened to find someone to roll the Samu-

rai after the April 20, 1988, long-course testing. CU proffers a benign explanation for Nappi's changing his story. Resolution of this dispute, however, is not critical to our decision.

**5.**  Suzuki also argues that CU deliberately excised footage of the Isuzu Trooper II's runs from the videotape screened at the press conference to downplay the fact that the Trooper also had trouble making it through the course.

### E. July 1988: Article Publication

CU's negative rating of the Samurai was detailed in an article entitled, "Warning: The Suzuki rolls over too easily," published in the July 1988 issue of *Consumer Reports*. The article was initially written by Landau, although drafts were reviewed by Pittle, Knoll, the ATD staff, CU's President Rhoda Karpatkin, CU's Technical Department and Library, and legal counsel.

The article described the steps CU took to test the Samurai, Jeep Wrangler, Isuzu Trooper II, and Jeep Cherokee. It began by recounting the incident in which an ATD staff member rolled the Samurai over on its side during the evaluation and break-in process. After detailing other evidence of the Samurai's safety problems, the article then described the long-course testing, noting that Pittle, "a staff member who does not normally drive the course," tipped the Samurai at 45 miles per hour after making "a slight steering misjudgment" that should not have "put daylight under the tires of any car." The article continued by highlighting the results of both short-course tests, concluding that "that *Suzuki Samurai* is so likely to roll over during a maneuver that could be demanded of any car at any time that it is unfit for its intended use. We therefore judge it Not Acceptable."

On June 2, 1988, CU submitted to NHTSA a copy of the article, the videotape from the press conference, and a diagram of its short course in support of a petition to establish a minimum stability standard to protect against unreasonable risk of rollover.

### F. NHTSA Report

On September 8, 1988, NHTSA issued a decision denying the motor vehicle defect petition filed earlier by the Center for Auto Safety. In its analysis, the NHTSA stated that "the rollover crash involvement of the Samurai appears to be within the range of most other light utility vehicles." [6] Denial of Motor Vehicle Defect Petitions, 53 Fed.Reg. 34,866 (Sept. 8, 1988). It concluded that the Ford Bronco II "was found to have more than 3 times the first event rollover ... involvement as the Samurai" and that "the Samurai had a first event rollover involvement corresponding to the [Chevrolet] S–10 Blazer." *Id.*

NHTSA's opinion also criticized CU's testing protocols, stating as follows: "The existing test procedures for assessing the rollover propensity of vehicles are unsatisfactory because they do not provide for repeatable, reproducible results, and there are no accepted performance criteria. The testing appears to rely on the skill and influence of the driver and the presumption that the vehicle suspension, tire, and road surface characteristics will remain constant throughout the testing." *Id.* at 34,867. NHTSA concluded by stating that, although the CU testing results were "cause for some concern," "the test procedures do not have a scientific basis and cannot be linked to real-world crash avoidance needs, or actual crash data. Using the same procedures, probably any light utility vehicle could be made to roll over under the right conditions and driver input." [7] *Id.* CU issued a subsequent article in *Consumer Reports* criticizing the NHTSA decision.

---

**6.** On September 25, 1996, NHTSA denied a second Samurai defect petition on similar grounds. Denial of Motor Vehicle Defect Petition, 61 Fed.Reg. 50,372 (Sept. 25, 1996).

**7.** In its summary of the test results on multipurpose vehicles, Britain's Department of

Transport similarly concluded that the "results from the modified Consumer Union tests were unpredictable" and that "[d]river influence is greatest in the modified Consumer Union manoeuvre." Dep't of Transp., Stability of Multi–Purpose 4–Wheel Drive Vehicles (Dec. 16, 1988).

### G. 1988–1996: CU's Republications of the Samurai Report and Further Rollover Claims

Between 1988 and 1996, CU republished references to the 1988 Samurai rating on at least 24 separate occasions in *Consumer Reports,* CU's annual buying guide, and other editions of CU's car books. During this time, CU states, several events bolstered its belief in the correctness of its "Not Acceptable" rating: a 1988 England-based Consumers' Association article that buttressed the Samurai rollover claim; a 1988 lawsuit filed by seven state Attorneys General charging Suzuki with false and misleading advertising regarding the Samurai's rollover potential (the case settled); the decision in *Malautea v. Suzuki Motor Corp.,* 148 F.R.D. 362, 375 (S.D.Ga. 1991), in which the court suggested that Suzuki knew of the Samurai's rollover propensity and did nothing to correct it; two separate multimillion dollar verdicts in the case of *Rodriguez v. Suzuki Motor Co.,* where juries determined that the Samurai was unreasonably dangerous due to its rollover propensity (both verdicts were reversed and the case settled); the disclosure of documents from the *Malautea* and *Rodriguez* cases suggesting that Suzuki knew of the Samurai's rollover propensity; and eight years of further SUV testing by CU during which time only the Samurai in 1988 and Isuzu Trooper in 1996 tipped up.

### H. January 1996: 60th Anniversary Issue of Consumer Reports

In its 60th Anniversary issue of *Consumer Reports,* published in January 1996, CU set forth a chronology that contained a picture of the Samurai tilted on two wheels, with the following caption:

> 1986 CU buys its own auto test track in rural Connecticut. Two years later, based on tests conducted there, CONSUMER REPORTS discovers the Suzuki Samurai easily rolls over in turns and rates it Not Acceptable. Sales of the Samurai dwindle away. Since 1936, dozens of products, from chemistry sets and toasters to power mowers and child safety seats, have been identified as safety hazards and rated Not Acceptable.

The same January 1996 issue also contained a section entitled "Memo to Members," in which CU's President stated that "we still find products that are unsafe: From kerosene heaters to the *Suzuki Samurai* to child safety seats, CONSUMER REPORTS has called them out—and our work goes on." [8]

### I. April 1996: Suzuki Files This Action

On April 11, 1996, Suzuki filed the instant action alleging that CU's ongoing publication of the negative Samurai rating constituted product disparagement.[9] After discovery, CU moved for summary judgment, challenging the sufficiency of Suzuki's evidence that CU had acted with actual malice in its reporting on the Samurai. The district court granted CU's motion and entered judgment in its favor. Suzuki timely appealed.

## II. STANDARD OF REVIEW

■ A grant of summary judgment is reviewed *de novo. Devereaux v. Abbey,*

---

**8.** In November 1995, CU published a car buyers guide on CD–Rom that also reiterated the "Not Acceptable" rating from its July 1988 *Consumer Reports* article.

**9.** After the action was filed, CU continued publicly to refer to the Samurai test, citing the "Not Acceptable" rating in a June 1996 *Consumer Reports* article on SUVs; sending out contribution solicitation cards in August and October 1996 with a photograph showing the Samurai tipped up on two wheels; and referring to the Samurai in a 1996 press conference and article about the Isuzu Trooper.

263 F.3d 1070, 1074 (9th Cir.2001) (en banc). This court's review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir.1999). We must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Devereaux*, 263 F.3d at 1074.

■■■ Because this case implicates the First Amendment protections of a media defendant in the context of product disparagement, "[t]he appropriate summary judgment question is whether a reasonable jury could find, by clear and convincing evidence, that [the plaintiff] has shown actual malice." *Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1039 (9th Cir.1998). In answering this question, we "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). "[T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in [its] favor. If[the plaintiff] does so, there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■■■ The dissent contends that, by applying the well-established summary judgment rules to the actual malice issue on summary judgment, we offend the "independent examination" standard of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This argument, however, conflates the summary judgment standard of review with application of the *New York Times* standard.

Neither the Supreme Court nor this court has applied the *New York Times* independent examination rule on review of a summary judgment in such a way as to jettison our standard of review when reviewing the grant of summary judgment in First Amendment cases. While it is true that the *New York Times* standard must be taken into account on summary judgment, starting with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court has been clear that the summary judgment standard applies to the actual malice issue:

> Consequently, where the *New York Times* "clear and convincing" evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns actual malice, clearly a material issue in a *New York Times* case, the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Id.* at 255–56, 106 S.Ct. 2505 (footnote omitted). *See also Masson*, 501 U.S. at 520, 111 S.Ct. 2419 ("On summary judgment, we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence."). And, as we have noted above, our case law also recognizes the application of the normal summary judgment standards to the actual malice issue. *See Kaelin*, 162 F.3d at 1039. Thus, contrary to the dissent's suggestion, *New York Times* does not require us to jettison our procedural rules governing the review of summary

judgment motions on the actual malice issue.[10]

## III. ANALYSIS

■ The parties do not dispute that for Suzuki to recover in this case, it must, as a public-figure plaintiff, prove by *clear and convincing evidence* that CU published disparaging statements about the Samurai with *actual malice.*[11] *See Unelko Corp. v. Rooney,* 912 F.2d 1049, 1057–58 (9th Cir. 1990) (stating that claims for product disparagement "are subject to the same first amendment requirements that govern actions for defamation"); *see also Isuzu Motors Ltd. v. Consumers Union of United States, Inc.,* 66 F.Supp.2d 1117, 1124 (C.D.Cal.1999); *Melaleuca, Inc. v. Clark,* 66 Cal.App.4th 1344, 78 Cal.Rptr.2d 627, 637 (1998); *cf. Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (assuming without deciding that proof of actual malice is required in a product dispar-

agement action brought by a public-figure plaintiff against a media defendant). Actual malice requires a showing that the defendant made a false statement "with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *accord Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

This Court has interpreted *Harte–Hanks* as providing two different tests for proving reckless disregard. *Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896, 900 (9th Cir.1992) (*Masson II* ):

Where the jury has proof that a publisher "actually had a high degree of awareness of probable falsity," that alone will establish that it "in fact entertained serious doubts as to the truth of [its] publication." Where such direct proof is missing, the jury may nevertheless infer

---

10. The cases cited by the dissent do not require otherwise. *See Andersen v. McCotter,* 100 F.3d 723, 725 (10th Cir.1996) (affirming that "[s]ummary judgment is appropriate when there is no genuine issue as to any material fact"); *Secrist v. Harkin,* 874 F.2d 1244, 1251 (8th Cir.1989) ("To withstand a motion for summary judgment, a public official or public figure must present evidence to support a jury finding that he or she has shown with convincing clarity that a defendant acted with actual malice."); *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293 (D.C.Cir.1988) ("The question for the court is 'whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.' " (quoting *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505)); *Herbert v. Lando,* 781 F.2d 298, 305 (2d Cir.1986) (affirming summary judgment standards).

Similarly, CU also misstates the applicable standard of review, contending that the normal summary judgment standard does not apply. The cases on which it relies, however, all involve the review of a judgment rendered after trial. *See Bose Corp. v. Consumers Un-*

*ion of United States, Inc.,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Newton v. Nat'l Broad. Co.,* 930 F.2d 662, 669 (9th Cir.1991); *Eastwood v. Nat'l Enquirer, Inc.,* 123 F.3d 1249, 1252 (9th Cir.1997). Thus, these cases do not, as CU suggests, require that we abandon the established standard of review in the summary judgment context.

11. Suzuki accepts the actual malice formulation of the product disparagement standard for the purposes of this appeal, although it suggests that the Supreme Court has left this issue open, *see Bose,* 466 U.S. at 492, 104 S.Ct. 1949, and reserves the right to challenge the standard on further review. *Amicus* Washington Legal Foundation devotes a substantial portion of its brief to arguing that the First Amendment does not demand a showing of actual malice for product disparagement claims. We decline, however, to address an issue raised only by an *amicus. See Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1141 n. 1 (9th Cir.1998) ("Generally, we will not consider on appeal an issue raised only by an amicus.").

that the publisher was aware of the falsity if it finds that there were "obvious reasons to doubt" the accuracy of the story, and that the defendant did not act reasonably in dispelling those doubts .... As *Harte–Hanks* points out, "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category."

*Id.* (quoting *Harte–Hanks,* 491 U.S. at 688, 692, 109 S.Ct. 2678) (brackets in the original).

Suzuki argues that the district court erred in concluding that a reasonable jury could not find that CU's statements regarding the Samurai met the actual malice standard. It contends that the evidence is sufficient to sustain a jury verdict under either test articulated in *Masson II* for proving CU's reckless disregard of the truth.

## A. Awareness of Probable Falsity

■ Suzuki first contends that a reasonable jury could find by clear and convincing evidence that CU had a high degree of awareness of the probable falsity of its statements about the Samurai. It argues that there is a sufficient evidentiary basis showing that CU knew that the Samurai did not tip up more easily than other SUVs and essentially rigged its testing to produce a predetermined result.

At the outset, CU raises a general challenge to Suzuki's argument, suggesting that the overwhelming weight of the evidence demonstrates the skill and dedication of CU in researching and publishing the Samurai story, and therefore militates against any finding of actual malice. CU assails Suzuki for taking "a few facts out of context, which it pieces together in a contrived and inherently implausible fashion without any supporting evidence." It argues that this court should reject Suzuki's arguments as conjectural and places great

weight on its own assertions that it absolutely believed in the truth of its statements.

In the summary judgment context, this argument is unconvincing. It is true that CU has offered evidence of its accuracy in reporting the Samurai story—or, at least, in its subjective belief that it accurately reported the story. But its characterization of its own evidence as overwhelming and its disparagement of Suzuki's evidence as out of context begs the question that we must resolve. The fact that CU employees believed in the truth of their negative statements about the Samurai cannot, by itself, defeat summary judgment. *See St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("The defendant in a defamation action ... cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."). Rather, the issue is whether there is adequate evidence to support the contrary view—namely, that behind the veneer of accuracy, CU was disseminating the Samurai story with knowledge, or reckless disregard, of its falsity. While it may be true that CU's evidence of meticulous reporting ultimately has more weight than Suzuki's evidence of actual malice, that is not a question to be resolved here. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

Turning to the evidentiary basis for Suzuki's claims, Suzuki contends that there is sufficient evidence that CU "rigged" the tests to produce the rollover result, demonstrating its awareness of the probable falsity of the negative Samurai rating. In support of this argument, Suzuki highlights the testimony of Denison, who stated that Landau, after witnessing Sheehan and Small's clean runs through the long course, said: "If you can't find someone to roll this car, I will." After this comment was allegedly made (and after Sheehan

and Small had taken the Samurai through 37 long-course runs without incident), Suzuki notes that Pittle, who was not a CU test driver, decided to drive the Samurai, tipping the vehicle after 10 runs to a cheer from a CU onlooker.[12] Suzuki also points to the fact that CU modified the long course, which it had used since 1973, to replicate the Pittle situation and then resumed its testing of the Samurai until it tipped up—again eliciting statements that can be construed as expressions of satisfaction ("That's it. That looked pretty good." "All right Ricky baby.").

This evidence is adequate to preclude summary judgment. A reasonable jury could find by clear and convincing evidence that CU sought to produce a predetermined result in the Samurai test. The timing of the course modification, the fact that the Suzuki was tested repeatedly until it tipped, and the reactions of CU employees all support such an inference. A permissible inference of reckless disregard follows from this evidence of "rigged" testing—if CU modified the course in order to cause a rollover, a reasonable jury could find that the truthfulness of any subsequent reports was vitiated.

Although it suggests that the facts have been taken out of context, CU does not seriously challenge Suzuki's argument of rigging. CU does question Suzuki's reliance on the Denison testimony, arguing that he had a high regard for CU's ethical standards and did not believe that anyone involved in CU's testing of the Samurai rigged the results. Denison did testify, however, that while he believed CU was honest 99.9 percent of the time, the 0.1 percent that he was excluding was the 1988 test of the Samurai. Moreover, although CU has its own interpretation of why it modified the long course and retested the Samurai, we, of course, cannot cred-

it that interpretation over Suzuki's at the summary judgment stage. The district court did not give adequate credit to this evidence of test-rigging.

Suzuki also contends that evidence of CU's avaricious motives supports an inference of actual malice. It suggests that the evidence reveals that CU was financially overextended due to capital investments in the period leading up to the Samurai report and needed a blockbuster story to raise CU's profile and increase fundraising revenues. It is not disputed that, at the time of the Samurai story, CU had incurred substantial debt for a new headquarters and that CU has used the Samurai story in its fundraising solicitations.

CU characterizes Suzuki's financial motive argument as an "unsupported accusation" and states that, instead of increasing revenues, CU's pre-publication press conference about the Samurai test actually decreased its sales of *Consumer Reports*. CU further contends that evidence of financial motive does not support a finding of actual malice under the relevant case law. *See Harte–Hanks*, 491 U.S. at 667, 109 S.Ct. 2678 ("Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice."). The district court adopted this argument in granting summary judgment.

We agree with Suzuki, however, that the district court erred in this regard. There is sufficient circumstantial evidence of a financial motive to support the ultimate conclusion of actual malice. While CU is correct that financial motive cannot, by itself, prove actual malice, it nonetheless is a relevant factor bearing on the actual malice inquiry. *See Harte–Hanks*, 491 U.S. at 668, 109 S.Ct. 2678; *Kaelin*, 162

---

12. The record does not indicate whether 10 runs was predetermined by the testing proto-

col or whether Pittle simply stopped making further runs after achieving a tip-up.

F.3d at 1042. The evidence of financial motive dovetails with the evidence of test-rigging described above. The fact that CU needed to boost its revenues to complete its capital campaign lends credence to Suzuki's contention that CU rigged the Samurai testing to produce the predetermined rollover result.

We conclude that the evidence of motive and test-rigging, in combination, is sufficient to preclude summary judgment and therefore requires reversal.[13]

## B. Purposeful Avoidance

■ Suzuki also argues that there was sufficient evidence for a jury to have concluded under *Masson II* that, in the face of obvious reasons to doubt the accuracy of its Samurai story, CU did not act reasonably in dispelling those doubts, thereby raising the inference that CU knew of the story's falsity. Under this approach, "[i]t is not ... the failure to act reasonably in itself that establishes malice; that failure is only a link in the chain of inferences that could (but need not) lead a jury to conclude that the publisher failed to conduct an investigation because it was already pretty much aware of the falsity." *Masson II*, 960 F.2d at 900. The central inquiry is whether the evidence discloses that a defendant purposefully avoided the truth. *Id.*

First, Suzuki claims that CU had reason to doubt its assertion that the Samurai's rollover propensity warranted a "Not Acceptable" rating. In particular, Suzuki points to the NHTSA decision issued in

September 1988 indicating that the Ford Bronco II had a three times greater rollover record than the Samurai, which had a rollover record corresponding to the Chevrolet S-10 Blazer. Additionally, CU learned in 1989 that the Samurai's rollover rate was less than the rollover rate of the Nissan Pathfinder, Toyota 4 Runner, Jeep CJ-7, and Ford Bronco II. Further, in 1992, the Insurance Institute for Highway Safety produced a report showing that the Samurai had a rollover rate lower than that of many other SUVs.

■ Second, Suzuki contends that CU had sufficient reasons to doubt the validity of the testing procedures it used to determine the negative Samurai rating. Here Suzuki again relies on the NHTSA study criticizing CU's testing procedures for failing to provide a basis for repeatable results and being overly dependent on driver influence. Suzuki also emphasizes the British Department of Transport study echoing these conclusions, as well as statements by Knoll and Sheehan suggesting that at least some CU personnel acknowledged that its testing procedures were overly driver-influenced. Suzuki asserts that, despite these indications that the Samurai rating rested on questionable data and suspect methodological premises, CU took no steps to engage in further investigation, thereby reinforcing the inference of purposeful avoidance. Suzuki faults CU for failing to incorporate instruments into its testing that would record how the driver was steering the vehicle and for never

**13.** Suzuki also advances a number of additional arguments in support of its contention that the summary judgment record is sufficient to show that CU acted with a high degree of awareness of the probable falsity of its report on the Samurai. Specifically, Suzuki contends that a jury could draw the inference that CU acted with actual malice based on the factual inaccuracies in the Samurai story; CU's premeditation in publiciz-

ing false statements about the Samurai; and CU's concealment of evidence contrary to its claim that the Samurai "rolls over too easily." Because the analysis set forth above is dispositive of the first prong of the *Harte–Hanks* test ("a high degree of awareness of probable falsity"), we need not reach Suzuki's remaining arguments in support of reversal based on *Harte–Hanks'* first prong.

evaluating its test results against real-world crash data. It suggests that CU's failure to do so violated accepted journalistic standards [14] and raises the inference that CU ignored contrary evidence that would confirm the falsity of its claims about the Samurai. The district court rejected much of this evidence, stating particularly that the NHTSA study was not entitled to greater weight than any other study or opinion regarding testing methods and therefore could not support a claim of actual malice.

■ In response to the NHTSA report, CU published an article in the November 1988 issue of *Consumer Reports* that addressed the NHTSA's critique of CU's negative Samurai rating. With respect to the issue of the Samurai's rollover rate, CU stated:

> According to NHTSA's own Crash Avoidance Research Data file, however, the *Suzuki Samurai's* rate of rollover in single-vehicle accidents is more than double the average for all sport-utility vehicles. In 1986, the most recent year for which there are figures, the *Suzuki* rolled over in 64 percent of all single-vehicle *Suzuki* accidents reported in this data base. The only vehicle that came close to the *Samurai* in rollover involvement is the now-discontinued *Jeep CJ–5* (49 percent). By contrast, the rollover rate for full-sized sedans was only 8 percent.
>
> NHTSA appears to have relied not on its statistics on rollover rates for single-vehicle accidents but on a different data base, one that includes only rollovers involving a *fatality*. Elsewhere, ...

[the NHTSA] notes that the *Samurai* was involved in six fatal rollovers per 100,000 vehicles on the road, a record the agency compares favorably with that of the *Ford Bronco II*—19 fatal rollovers per 100,000 vehicles on the road.

> CU has learned that the overall rollover rate for the *Bronco II* is high—about the same as that for the *Jeep CJ–5*—but not nearly as high as the *Suzuki's*. The higher number of *fatalities* in *Bronco II* rollovers could come about for a number of reasons. The *Suzuki* rolled over at a relatively low speed in our accident-avoidance tests; if *Bronco II* rollovers occurred at higher speeds, one would expect more fatalities per rollover. One would also expect more fatalities if the *Bronco II* were driven more miles, on average, than the *Suzuki.*

Regarding the NHTSA's criticisms of CU's testing protocols, the article went on to state:

> NHTSA did no independent testing of the *Suzuki's* rollover propensity. Rather, it uncritically accepted Suzuki's data, saying Suzuki "demonstrated that the Samurai satisfactorily completed industry accepted ... tests which might be used to assess a vehicle's rollover propensity."
>
> But there are no industry-accepted tests for rollover propensity—a point NHTSA itself makes elsewhere in its letter....
>
> [One] test performed for Suzuki looks superficially like an avoidance maneuver, since the car was run through a slalom course. But in a realistic avoidance ma-

---

**14.** Relying on expert witness testimony, Suzuki asserts that CU violated accepted journalistic standards in failing to engage in further investigation of contradictory evidence. CU responds that the expert testimony is irrelevant because it is not probative of CU's subjective state of mind. *See, e.g., Harris v. Quadracci*, 856 F.Supp. 513, 519 (E.D.Wis.1994).

Although expert testimony regarding CU's departure from accepted professional standards is not sufficient by itself to establish actual malice, *see Harte–Hanks*, 491 U.S. at 669, 109 S.Ct. 2678, it does shed light on the propriety of CU's response to contrary rollover evidence and, thus, is entitled to be given appropriate weight.

neuver, a car is steered first to the left and then back to the right immediately. In the Suzuki test, the car was steered to the left, then straightened and allowed to recover before returning to the right lane. That is a simple lane-changing maneuver, not an accident-avoidance maneuver.

NHTSA also adopted as its own another of Suzuki's arguments: Using the accident-avoidance maneuver developed by CU, the agency stated, "probably any light utility vehicle could be made to roll over." But NHTSA offered no evidence or independent test results to support such speculation. In fact, no vehicle other than the *Suzuki* has rolled over in the 10 years we've tested for accident avoidance.

The critical inquiry under *Masson II* is whether CU failed to act reasonably in investigating and responding to contrary studies in a manner that suggested it was attempting purposefully to avoid discovering the truth of the matter. In general, the analysis conducted and published by CU in response to the NHTSA study is not indicative of purposeful avoidance. To the contrary, in the November 1988 article, CU challenged the NHTSA report head on, stating its disagreement in detail and supporting its alternative conclusions with substantive justifications. To the extent that there were contrary rollover statistics, CU analyzed them and explained why they did not warrant a conclusion at odds with its initial assessment of the Samurai. In response to the NHTSA's critique of CU's testing, CU argued that the Suzuki tests upon which the NHTSA relied were flawed. While Suzuki may disagree with CU's discussion of the rollover statistics or its criticisms of Suzuki's own accident avoidance tests, such disagreement does not demonstrate CU's purposeful avoidance of critical facts.

While we agree with CU, however, that much of Suzuki's purposeful-avoidance argument boils down to its disapproval of CU's conclusions, there is one issue that nevertheless precludes summary judgment here. In particular, CU has done nothing to respond to the criticism of its testing procedures as overly influenced by driver input. This evidence formed the basis for the district court's decision in *Isuzu Motors*, in which the court relied heavily on the NHTSA report to deny CU's summary judgment motion, stating that "CU was aware that its tests were significantly reliant upon driver input and skill." *Isuzu Motors*, 66 F.Supp.2d at 1125. Suzuki has pointed to further evidence that some CU personnel shared this assessment. The issue is whether CU, armed with the knowledge that its tests were potentially flawed in this way, failed reasonably to investigate in such a manner that could lead a jury to conclude by clear and convincing evidence that CU was aware of the falsity of its Samurai report. Drawing all reasonable inferences in favor of Suzuki on this point, CU's failure to address this deficiency with its testing procedure could lead a jury to conclude that it was aware that doing so would disclose the falsity of its negative Samurai rating.

Therefore, we conclude that Suzuki has also raised a genuine issue of material fact as to whether CU purposefully avoided information that would have undermined its assessment of the Samurai's rollover propensity.

## IV. CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is reversed and the case remanded for further proceedings.[15]

**REVERSED and REMANDED.**

15. We, of course, intimate no view of the ultimate outcome on the merits.

FERGUSON, Circuit Judge, dissenting:

I respectfully dissent. By failing to apply the full procedural protections afforded by the First Amendment, the majority intrudes on the field of free expression in two of its most important contexts—consumer protection and public safety.

In *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that specific constitutional protections of speech limit the state's power to award damages in libel actions brought by public officials. *Id.* at 283, 84 S.Ct. 710. One means of protecting speech is the actual malice standard, which is set forth by the majority in our case. Majority Op. at 1202; *see also New York Times*, 376 U.S. at 285–86, 84 S.Ct. 710. Another means is the independent examination rule, which requires an appellate court to independently review the whole record, "so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of expression." *New York Times*, 376 U.S. at 285, 84 S.Ct. 710 (citation omitted). In adopting the actual malice standard and independent examination rule, the Supreme Court noted the importance of protecting "the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *Id.* at 270, 84 S.Ct. 710. The Court also recognized that an "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the breathing space they need[ ] to survive." *Id.* at 271–72, 84 S.Ct. 710 (internal quotation marks and citation omitted).

The majority undermines these procedural protections both by failing to adopt the independent examination rule in the summary judgment context and by erring in its application of the actual malice standard.

### 1. Independent Examination

The majority dismisses the argument of Consumers Union of United States, Inc. ("Consumers Union") that we must conduct an independent examination of the record under *New York Times*. Majority Op. at 1201–02 & n. 10. In doing so, the majority overlooks the ongoing debate among the courts and legal scholars regarding the applicability of the "independent examination" rule of *New York Times* to appeals from summary judgment motions.[1] Thus, the majority avoids the difficult issue at hand, i.e., whether the additional procedural protection of independent examination is applicable in this case.

From the outset, it is worth noting that it is an open question as to whether the independent examination rule applies to appeals from summary judgment. In fact, the Supreme Court has recognized that the scope of procedural protections in First Amendment cases remains unclear. *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (recognizing that, although "some procedural requirements are mandated by the First Amendment, and some are not[,]" the Court has not "discovered a general principle to determine where the line is to be drawn.").

In *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the Supreme Court held that the clearly-erroneous stan-

---

1. *See, e.g.,* Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases,* 107 Yale L.J. 2431, 2432, 2443–45 (1998); Scott Matheson, Jr., *Procedure in Public Person Defamation Cases: The Impact of the First Amendment,* 66 Tex. L.Rev. 215, 289–97 (1987); Lee Levine, *Judge and Jury in the Law of Defamation: Putting the Horse Behind the Cart,* 35 Am. U.L.Rev. 3, 50–91 (1985). The debate among the circuits is discussed further below.

dard of review under Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review for determinations of actual malice. *Id.* at 514, 104 S.Ct. 1949. The Court emphasized the importance of independent appellate review as enunciated in *New York Times,* describing it as "a rule of federal constitutional law" that "reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." *Id.* at 510–11, 104 S.Ct. 1949.

Since *Bose Corp.,* several of our sister circuits have extended the rule of independent examination to the summary judgment context. *See, e.g., Andersen v. McCotter,* 100 F.3d 723, 725 (10th Cir. 1996); *Secrist v. Harkin,* 874 F.2d 1244, 1251 (8th Cir.1989); *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293 (D.C.Cir.1988); *Herbert v. Lando,* 781 F.2d 298, 308 (2d Cir.1986); *cf. Bartimo v. Horsemen's Benevolent & Protective Ass'n,* 771 F.2d 894, 898 (5th Cir.1985) (conducting independent review of the record on appeal from a directed verdict for the defendant).

However, the applicability of the independent review to appeals from summary judgment remains uncertain within our cir-cuit. *Compare Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 535 (9th Cir.1984) (conducting an independent review of the record to ensure that protected speech was not impermissibly inhibited),[2] *with Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1039 (9th Cir.1998) (failing to discuss the applicability of the independent review rule). Despite it being an open question, the majority brushes aside Consumers Union's argument that we must independently review the record.[3] This is an error, and I would find that the rule of independent examination applies in the summary judgment context.

The application of the independent review rule is the logical extension of *New York Times* for it addresses the Supreme Court's concerns regarding the chilling of speech. 376 U.S. at 278, 84 S.Ct. 710 ("Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive."). As a practical matter, the threat and actual cost of litigation, including attorneys fees, inhibit speech. *See id.* at 278–79, 84 S.Ct. 710; *see also Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 280 n. 76 (3d Cir.1980) ("The cost of litigating a libel action, burdensome on even the largest news organizations,

**2.** This decision was reversed on other grounds by the Supreme Court in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). In its opinion, the Supreme Court specifically declined to address this issue. *Id.* at 53 n. 3, 106 S.Ct. 925 ("We need not review the correctness of the Court of Appeals' interpretation of *Bose Corp.,* since we determine that, under any standard of review, the District Court's findings should not have been disturbed.").

**3.** In addition, the majority misconstrues my argument, contending that the adoption of the independent examination rule would override the summary judgment standard that we have previously applied to the actual malice issue. Majority Op. at 1201–02. However, the majority ignores the fact that other circuits have applied the independent examination rule consistent with the summary judgment standard. *See, e.g., Secrist v. Harkin,* 874 F.2d at 1251; *Herbert v. Lando,* 781 F.2d at 305, 308. In applying both standards in conjunction, we would determine whether there is a genuine issue of material fact as to actual malice under the summary judgment standard. In doing so, we would "make our own independent review of the record to ensure the principles of actual malice are constitutionally applied." *Secrist,* 874 F.2d at 1251.

often can cripple smaller news operations."). At times, the costs of a successful defense can be the same or greater than what the damage awards would have been. *See* Lee Levine, *Judge and Jury in the Law of Defamation: Putting the Horse Behind the Cart,* 35 Am. U.L.Rev. 3, 38 (1985). Moreover, the defense costs prior to trial can be extraordinarily high. *See id.* at 91.

Because of these costs and their effects on speech, the procedural protection of the independent examination rule is necessary not only for appellate review of post-trial decisions, but also for appellate review of summary judgment decisions. The independent examination rule provides further protection of the media's First Amendment rights. Moreover, it addresses concerns regarding the chilling effects on speech of successive, costly litigation. *See Steaks Unlimited, Inc.,* 623 F.2d at 280 ("Regardless whether particular statements made by consumer reporters are precisely accurate, it is necessary to insulate them from the vicissitudes of ordinary civil litigation in order to foster [the goals of] the First Amendment....").

## 2. Applying the Procedural Protections Mandated By New York Times

The majority incorrectly applies the actual malice standard and disregards the importance of independent review. By doing so, it allows a forbidden intrusion on the field of free speech.

The majority fails to contextualize Consumers Union's testing of the Samurai within the purpose and mission of the organization. The District Court recognized the importance of this when it stated: "The trier of fact could not be expected to disregard the nature of defendant's business—testing and reporting on consumer products—nor would plaintiff so urge, and it would be error for a court to so instruct. Thus, it is clear that, based on the infor-mation CU had gathered, it was concerned about the safety of the Suzuki Samurai." Viewed in this context, the actions and words of Consumers Union were appropriate. Consumers Union began its investigation of a product with the assumption that it could or might be unsafe. Once the product had performed in a manner that could be deemed unsafe, Consumers Union continued to test it more rigorously. Although the events that occurred in this case suggest that Consumers Union's representatives had the intractable, "bulldog" mentality of a consumer advocacy organization, the facts do not evince actual malice as required by the law.

In addition, this is not a case in which Consumers Union contrived to make the Samurai roll over. Suzuki admits that there had been four independent lawsuits in which the vehicle rolled over, including one lawsuit by the Attorney Generals of seven states. Certainly, when choosing to republish references to the rating, numerous rollover instances such as these reaffirmed Consumers Union's opinion that the vehicle was "Not Acceptable."

On a broader level, the majority's reasoning has troubling implications. If taken to its logical end, the majority's reasoning will allow *any* deficiency in a consumer group's test to become the grounds for litigation. This will inhibit the speech of organizations and individuals who would fear voicing their findings and views because of the threat of litigation. *See New York Times,* 376 U.S. at 278–79, 84 S.Ct. 710. Suppression of such speech will create less informed consumers and hinder public safety and health. *See Steaks Unlimited, Inc.,* 623 F.2d at 280 (discussing the importance of First Amendment protection for consumer reporting). Moreover, it will give the government the sole voice in this field. In cases, such as this, where the consumer organization disagrees with the government agency's find-

ings or where the agency criticizes the organization's findings, companies will be able to use this fact as proof that the organization was acting with actual malice.[4]

As stated by the majority, the appropriate standard is whether a reasonable jury could find by clear and convincing evidence that Suzuki proved actual malice on the part of Consumers Union. Here, no reasonable jury could find clear and convincing evidence of actual malice. *See Kaelin,* 162 F.3d at 1039. After an independent review of the record, it is unquestionable that the District Court constitutionally applied the principles of actual malice. The grant of summary judgment was necessary both to avoid the inhibition of free speech by the media and to protect public safety and health. For these reasons, I would affirm the District Court's decision.

---

**4.** This concern is most likely part of the reason that the District Court stated that the NHTSA study was not entitled to greater weight than any other study or opinion regarding testing methods. The majority, however, chooses to give the NHTSA study greater weight and, thus, discourages the non-governmental voices in the fields of consumer protection and vehicle safety. Majority Op. at 1203–05.