**Gennifer FLOWERS, Plaintiff,**

**v.**

**James CARVILLE, George Stephanopoulos, Little, Brown & Company, Defendants.**

**No. CVS991629PMP(LRL).**

United States District Court,
D. Nevada.

March 8, 2004.

John Lukens, Rex Bell, Bell Lukens Marshall & Kent, Las Vegas, NV, Larry Klayman, Michael Hurley, Paul Orfanedes, Judicial Watch, Inc., Washington, DC, for Plaintiff.

Andrew Gordon, McDonald Carano Wilson, Walter Cannon, Rawlings, Olson, Cannon, Gormley & Desruisseaux, Paul Hejmanowksi, Lionel, Sawyer & Collins, Las Vegas, NV, Patricia Lundvall, McDonald Carano Wilson, Reno, NV, Laura Handman, Matthew Leish, Davis Wright Tremaine LLP, David Kendall, Gabriel Gore, Williams & Connolly LLP, Washington, DC, Jo Marsh, William McDaniel, McDaniel & Marsh, Baltimore, MD, for Defendants.

### ORDER and JUDGMENT

PRO, Chief Judge.

Currently before the Court are the Motion of Defendant James Carville for Summary Judgment (Doc. # 149), filed August, 22, 2003, and Defendants George Stephanopoulos and Little, Brown & Company's Motion for Summary Judgment (Doc. # 183), filed January 9, 2004. Plaintiff

Gennifer Flowers ("Flowers") filed her Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant Carville's Motion for Summary Judgment (Doc. # 164) on September 26, 2003, and Supplemental Memorandum of Points and Authorities in Opposition to Defendant Carville's Motion for Summary Judgment (Doc. # 190) on February 9, 2004. On February 9, 2004, Flowers also filed Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants George Stephanopoulos and Little, Brown & Company's Motion for Summary Judgment (Doc. # 191). On February 23, 2004, Defendants filed Reply Memorandum in Further Support of the Motion of Defendant James Carville for Summary Judgment (Doc. # 195) and Reply Memorandum of Defendants George Stephanopoulos and Little, Brown & Company in Further Support of Summary Judgment (Doc. # 193).

## I. BACKGROUND

This case arises from a 1992 news story carried by the *Star* in which Flowers described her affair with then presidential candidate, Bill Clinton. Flowers supported the *Star* report with audio tapes of conversations which she said were held between her and Clinton during the affair. On January 27, 1992, Flowers held a press conference during which she played one tape containing excerpts from the taped conversations. (Reply Memorandum in Further Support of the Mot. of Def. Carville for Summ. J. (Doc. # 195), Ex. A at 137.)

Flowers' Complaint claims Defendants James Carville ("Carville"), George Stephanopoulos ("Stephanopoulos") and Stephanopoulos's publisher, Little, Brown & Company ("Little Brown") defamed her and held her in a false light when they said CNN and KCBS had found the tapes were "doctored" or "selectively edited." Addi-

tionally, the Complaint alleges Carville and Stephanopoulos conspired to defame her.

### A. The News Reports

Most of the allegedly defamatory statements involve two news reports that appeared in early 1992 in response to the *Star* story and the Flowers press conference. CNN aired a report on the authenticity of the tapes on February 1, 1992. (Defs. Stephanopoulos and Little Brown Mot. for Summ. J. at 7.) The KCBS report appeared on January 29, 1992. (*Id.* at 5.)

In the CNN report, Brooks Jackson introduced Steve Cain ("Cain") (also spelled Kean in various pleadings), an expert who "subjected the tapes to more than 20 hours of analysis." (Mot. of Def. Carville for Summ. J. (Doc. # 149), Ex. A at 2.) Jackson reported "Kean says he found indications that somebody may have doctored the tapes. Indications including four breaks in the audio." (*Id.* at 2–3.) Cain also appeared in the report stating: "And again this happens on several occasions. I found a number of suspicious areas that we call anomalies, which would indicate that perhaps there may have been some deliberate editing of the tapes." (*Id.* at 3.)

The report observed Flowers and the *Star* "denied any tampering with the tapes" and noted Cain had also said the anomalies could have an innocent explanation. The piece ends with Cain's final quote and Jackson's follow-up:

Cain: I don't think the evidence should be trusted. I think an examination should be made of the original tape.

Jackson: But we're not getting the original tapes. Instead the tabloid is printing in its next edition more transcripts of alleged conversations between Clinton and Flowers. But this, a tabloid spokes-

man says, is there (sic) Gennifer Flowers finale.

(*Id.* at 3–4.)

The KCBS report began with a clip of Anthony Pellicano ("Pellicano"), identified in the report as an "audio expert," showing a graphic rendition of the voices on the tape and pointing out an audio break within a conversation between Flowers and Clinton. (Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (Doc. # 183), Ex. E at 2.) Pellicano opined, "Someone took the original tapes and edited down different portions to give you an audio movie, so to speak, of something that wasn't within continuity. There are portions missing." (*Id.* at 3.)

Although the KCBS report contains no qualifiers regarding the conclusiveness of Pellicano's findings, a *Los Angeles Times* article, published the day after Pellicano appeared on television, quoted him as saying, "I don't know that it was 'doctored,' but it was 'selectively edited.'" (Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (Doc. # 183), Ex. L.) The article states Pellicano's final conclusion is that "[t]he tape is suspect at best," but notes "without access to the original tapes he cannot prove his suspicions." (*Id.*)

## B. Defendants' Statements

Defendants made four statements based on these news reports which Flowers alleges are defamatory. The first is James Carville's statement made during his appearance on the cable television show *Larry King Live*, on January 21, 1998. In response to a caller who suggested the tapes made by Linda Tripp might be "dubbed, like the Gennifer Flowers and Elgene Lewis' tapes were," Carville said: "One of the things is—remember, we'll go back to the Gennifer Flowers statement, I think the [sic] found that tape was doctored and CNN even found out, like 10 or 12 different places. So you have to be careful." (Mot. of Def. Carville. for Summ. J. (# 149), Ex. D.)

The final three statements were made by George Stephanopoulos. The first is also from an appearance on *Larry King Live*, on February 2, 1998, in which Stephanopoulos participated in the following exchange regarding Gennifer Flowers:

KING: The tape was damaging?

STEPHANOPOULOS: The tape was damaging, but it was also doctored.

KRISTOL: It wasn't doctored. She merely taped, as I understand it, the messages he left. She had to put them together on one tape so she taped from a tape. There's no evidence of doctoring of what had been said.

STEPHANOPOULOS: Absolutely untrue. Both Brooks Jackson of CNN and KCBS ... in 1992 showed that the tapes were doctored and that's what we said in 1992.

(Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (Doc. # 183), Ex. T at 15.) Stephanopoulos made his second statement in his book, *All Too Human*, published in March of 1999 by Little Brown. (Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (Doc. # 183) at 12.) In the book, Stephanopoulos describes what he thought while watching the Flowers press conference in 1992: "The conversation did sound stilted; her questions were leading—maybe the tapes were doctored? It's a setup." The passage continues in the present, "Later investigations by CNN and KCBS would show that the tapes were 'selectively edited,' but there was no getting around the fact that by talking to her on the phone, Clinton had put everything we had worked for at risk." (*Id.*) Finally, Stephanopoulos appeared on *Tim Russert* on May 20, 2000, and made another statement about the

tapes: "Oh it was absolutely his voice, but they were selectively edited in a way to—to create some—some impression." (*Id.* at 14–15.)

## C. Discovery

The Ninth Circuit Court of Appeals has held that Flowers is a public figure in regard to this controversy and must prove Defendants acted with actual malice to sustain her claims. *Flowers v. Carville,* 310 F.3d 1118, 1129 (9th Cir.2002). On August 18, 2003, Defendants filed Defendants' Motion for Entry of Defendants' Proposed Discovery Plan and Scheduling Order (Doc. # 146) proposing that the Court bifurcate discovery with "an initial discovery period limited to actual malice, followed by dispositive motions." Discovery on the issue of falsity, damages, and other issues would follow only if the Court denied summary judgment for the Defendants on the issue of actual malice. (Mot. for Entry of Defs.' Proposed Disc. Plan and Scheduling Order (Doc. # 146) at 8.) The Magistrate Judge, Lawrence R. Leavitt, granted Defendants' motion and set December 8, 2003, as the date for close of discovery on the issue of actual malice. (Order, September 8, 2003 (Doc. # 156).)

Later, Magistrate Judge Leavitt granted Flowers' request to extend the discovery deadline to December 19, 2003, in order to depose Pellicano who was then incarcerated at the Metropolitan Detention, Los Angeles, California, awaiting sentencing of federal convictions for two counts of illegal possession of firearms. (Order, December 5, 2003 (Doc. # 182). at 1; Plaintiff's Emergency Mot. for Leave of Court to Depose Witness Confined in Prison (Doc. # .179) at 2.) Flowers alleges Pellicano appeared on KCBS while he was also working as a private detective for the Clinton campaign. (*Id.* at 1–2.) However, Flowers did not depose Pellicano at the prison in which he was incarcerated because he did not receive the subpoena informing him of the deposition, scheduled for 8:00 am on December 19, until noon of the same day. (Letter from Anthony Pellicano to Nevada District Court, filed January 5, 2004.) Because he had not received the subpoena and his lawyers were not present, Pellicano refused to testify. (*Id.*) No further efforts were made by any party to this action to thereafter depose Pellicano.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "When determining if a genuine issue exists as to actual malice in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times.* ... [T]he judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the inquiry becomes "whether a reasonable jury could find by clear and convincing evidence that [the defendant] has shown actual malice." *Kaelin v. Globe Communications Corp.,* 162 F.3d 1036, 1039 (9th Cir.1998).

However, a court considering summary judgment makes all "justifiable inferences" in favor of the nonmoving party, including "questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). If a plaintiff can come forward with clear and convincing evidence from which a jury could find actual malice, he is entitled to a trial even

if there is conflicting evidence on the issue. *Kaelin,* 162 F.3d at 1041 (citing *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505).

The Ninth Circuit Court of Appeals has recently considered what evidence meets the summary judgment standard for malice. In *Kaelin* the Court determined that Kaelin had met his burden on summary judgment in his defamation claim against the *Globe,* a newspaper that had published a story about police suspicions that Kaelin had perjured himself with the headline "COPS THINK KATO DID IT!." 162 F.3d at 1039. The Court reasoned the *Globe* knew someone who read the headline only could reasonably conclude the story was about the possibility that Kaelin had murdered Nicole Simpson and Ron Brown, thus the headline was capable of a defamatory meaning. *Id.* at 1040. On the issue of malice, the Court denied the *Globe's* motion for summary judgment because of the paper's admission it knew Kaelin was not a murder suspect and the *Globe* editor's admission that he did not think the headline "was very accurate to the story" and was " 'a bit concerned' that readers might connect the 'it' in the headline with the murders." *Id.* at 1042.

The Court considered the same issue in *Suzuki Motor Corp. v. Consumers Union of U.S.,* in which Suzuki brought suit when *Consumer Reports* published an article concluding a Suzuki vehicle rolled over too easily. 330 F.3d 1110, 1129, 1132 (2003). The Court concluded Suzuki had met its burden on the issue of malice because one plausible interpretation of the record was that "CU 'rigged' a test to achieve a predetermined result in order to serve its own pecuniary interests." *Id.* at 1133. The evidence on the record included: 1) a CU officer saying "If you can't find someone to roll this car, I will;" 2) a cheer from a CU onlooker when the Suzuki did roll over; 3)

CU's decision to modify the difficulty of the course it had used for fifteen years in order to test the Suzuki and other cars again; and 4) more "statements that could be construed as satisfaction"[1] when the Suzuki rolled over on the more difficult course. *Id.* at 1135.

 Finally, when ruling on a summary judgment motion a trial court can consider only admissible evidence. *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 773 (9th Cir.2002) (citing Fed.R.Civ.P. 56(e)). Unauthenticated documents cannot be considered in a motion for summary judgment. *Id.* " '[D]ocuments can be authenticated by a witness who wrote it, signed it, used it, or saw others do so.' " *Id.* (quoting 31 Wright & Gold, *Federal Practice and Procedure: Evidence* § 7106, 43 (2000)). Additionally, although a party seeking or opposing summary judgment "does not have to produce evidence in a form that would be admissible at trial" they must satisfy the requirements of Rule 56(e). *Block v. City of Los Angeles,* 253 F.3d 410, 419 (9th Cir.2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rule 56(c) allows a court to consider affidavits; however, Rule 56(e) states affidavits "shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence. . . ."

## III. DISCUSSION

 Flowers argues she has presented facts sufficient for a jury to find Defendants acted with malice. (Pl.'s Memorandum of Points and Authorities in Opp'n to Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (Doc. # 191) at 28; Pl.'s Supplemental Memorandum of Points and Authorities in Opp'n to Def. Carville's Mot. for Summ. J. (Doc. # 190) at 22.) She

---

**1.** "That's it. That looked pretty good." "All right Ricky Baby." *Suzuki,* 330 F.3d at 1135.

asserts Defendants ignored obvious warning signs that the tapes could be genuine and had motive and intent to defame her. Additionally, she contends Stephanopoulos had conversations with Pellicano during this period and a jury could infer from this that Defendants had a hand in manufacturing the KCBS report.

In response, Defendants argue the language they used in their statements contained the material import or a reasonable interpretation of what CNN and KCBS found. They acknowledge their books make it clear they were dismayed by Flowers actions and were happy to believe her story was false; however, they note that bias is not enough to show malice. Additionally, they take issue with the quantity and quality of Flowers' evidence supporting a connection between Pellicano and the Defendants.

Proof of malice requires direct or circumstantial evidence that the defendant published the statement with "knowledge of falsity or reckless disregard as to truth or falsity." *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In this case, the Ninth Circuit has said Flowers could survive summary judgment in two ways. *Flowers v. Carville,* 310 F.3d 1118, 1131 (9th Cir.2002). She could offer "clear and convincing evidence that [D]efendants knew the news reports were probably false or disregarded obvious warning signs from other sources." *Id.* Alternatively, she could present "clear and convincing evidence that any defamatory, material discrepancies between the news reports and the statements were intentional and reckless." *Id.* at n. 11. Consequently, summary judgment hinges on two related inquiries: 1) did Defendants know of or disregard information proving the tapes were genuine when they said CNN and KCBS found the tapes were doctored or selectively edited; and 2) did Defendants' description of the news reports' findings contain intentional, defamatory discrepancies.

## A. Knowledge or Reckless Disregard

When a court determines whether a defendant knew of or recklessly disregarded possible falsity it must look to the defendant's subjective state of mind. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). A defendant who *"in fact* entertained serious doubts as to the truth of his publication" has acted with malice and reckless disregard for the truth. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (emphasis added). Proof that a reasonable person would have investigated before publishing or refrained from publishing does not establish the requisite state of mind on the part of the defendant. *Id.*

"[A] plaintiff is entitled to prove a defendant's state of mind through circumstantial evidence." *Harte–Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (citing *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)). "[E]vidence of negligence, motive, and intent may be used, cumulatively, to establish the necessary recklessness. It is clear that in most instances one factor alone will not establish actual malice by convincing clarity." *Nev. Indep. Broad. Corp. v. Allen,* 99 Nev. 404, 664 P.2d 337, 344–45 (1983) (citations omitted).

However, "actual malice alone may not be inferred from evidence of personal spite, ill will or intention to injure on part of the writer." *Harte–Hanks,* 491 U.S. at 667 n. 7, 109 S.Ct. 2678. Additionally, "courts must be careful not to place too much reliance on such factors." *Id.* at 668, 109 S.Ct. 2678. In *Harte–Hanks,* the Su-

preme Court considered the effect of circumstantial evidence that a newspaper had several motives for publishing a libelous story about a candidate for municipal judge whom they had not endorsed. *Id.* at 664–668, 109 S.Ct. 2678. The Court noted the newspaper had an interest in the re-election of the opposing candidate, which it had endorsed, and in running a story that discredited the story of its rival newspaper. *Id.* at 664–65, 109 S.Ct. 2678. But the Court also based its finding of malice on other strong evidence that the newspaper's witness was not reliable and the newspaper had intentionally avoided taking action that would have either confirmed or dispelled any doubts about the story's veracity. *Id.* 692–93, 109 S.Ct. 2678.

When a defendant republishes a statement made by a third person, there are additional considerations. Generally, "[o]ne who repeats what he hears from a reputable news source, with no individualized reason external to the news report to doubt its accuracy has not acted recklessly." *Flowers*, 310 F.3d at 1130 (citing *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). However, in the present case, the Ninth Circuit has noted:

> Defendants were not uninvolved third parties who clearly lacked access to the facts behind the published reports. If they knew that the news reports were false or had information from other sources that raised obvious doubts, then they didn't 'rely' on the news stories; they simply hid behind them....
>
> ....
>
> ... If Flowers can prove that [D]efendants were involved in manufacturing the two news stories, she may be able to persuade a jury that they knew the sto-

ries were false or recklessly disregarded the truth.

*Id.* at 1131.

Furthermore, a defendant who republishes a statement that is subject to multiple interpretations is entitled to choose the interpretation with which he agrees. *Time Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). In *Pape*, the United States Supreme Court addressed the issue of actual malice in a defendant who published a statement interpreting someone else's description of a news worthy event. *Id.* Noting such a report "can contain an almost infinite variety of shadings," the Court concluded "the adoption of one of a number of possible rational interpretations of a document that bristle[s] with ambiguities .... [even] though arguably reflecting a misconception [is] not enough to create a jury issue of malice under *New York Times.*" *Id.* at 286–90, 91 S.Ct. 633.

Flowers argues Defendants ignored obvious warning signs that the news reports did not conclusively determine that someone had interfered with the tapes, among them: 1) CNN's expert, Cain stated the original tapes should be analyzed; 2) the CNN report stated there might be an innocent explanation for the breaks in the audio and mentioned Flowers' denial that anyone had tampered with the tapes; 3) in the *Los Angeles Times* news story Pellicano said "I don't know that it was 'doctored' ... but it was selectively edited;" and 4) Defendants were aware that none of the news stations had the original tapes or even copies of the original tape, but instead had a copied "12 minute excerpt from a 70 minute tape of a half a dozen conversations." (Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (# 183), Ex. O.)

The Court finds that this evidence would not support a finding by a reasonable jury

that there is clear and convincing proof Defendants published their statements with knowledge of falsity or reckless disregard. The "gist or sting" of the reports was that the tapes were probably suspect, not that they were probably genuine. At most the qualifying language made the reports ambiguous, in which case, Defendants' statements are a rational interpretation of that ambiguity. Furthermore, the qualifying language in the reports from CNN and the *Los Angeles Times* story and the fact that no member of the media had access to the original tapes were part of the general story and widely available and known to the public. These facts are not what the Ninth Circuit described when it held Defendants might have acted with malice if their greater access to the "facts behind the published reports" had provided them with "information from other sources that raised obvious doubts." *Flowers,* 310 F.3d at 1130.

Flowers contends that Little Brown acted with malice because its attorneys vetted Stephanopoulos' book, *All Too Human,* and they also would have been aware of the qualifying language in the news reports and the unavailability of the original tapes. Assuming Flowers' assertion is true this is not sufficient for a reasonable jury to find by clear and convincing evidence that Little Brown either knew that Stephanopoulos' statement in *All Too Human* was false or recklessly disregarded obvious warning signs that it was false.

Flowers' remaining evidence against Defendants Stephanopoulos and Carville is two-fold. First, she asserts Defendants had contact with the KCBS expert, Pellicano, and offers Stephanopoulos' statement in his deposition that he "may have talked to [Pellicano] about what he was saying to KCBS, what he thought about the tapes .... around the time the KCBS report came out." (Pl.'s Supplemental Memorandum of Points and Authorities in Opposition to Defendant Carville's Motion for Summ. J. (Doc. # 190), Ex. 11 at 123–24.) She also cites documents produced by Stephanopoulos during discovery, which she asserts are the typewritten notes of writer Bill Novak ("Novak") on his conversations with Stephanopoulos in preparation for writing *All Too Human.* (Pl.'s Supplemental Mem. of Points and Authorities in Opp'n to Def. Carville's Motion for Summ. J. (# 190) at 8–9; *Id.,* Ex. 10.) The first page of the notes contains the statement: "I was talking to Pellicano every day, the tape expert. They wouldn't give out the real tape. We spent time dissecting her story and showing that this wasn't a conversation between two intimates; she got the hotel wrong, a lot of details wrong." (*Id.,* Ex. 10.) [2]

Second, Flowers offers an extensive selection of quotes from the books by Defendants Carville and Stephanopoulos. She contends the quotes are admissions by these Defendants that they were dismayed by the publication of her story in the *Star,* wanted to believe it was not true, and formulated a plan to neutralize its bad effects on the Clinton campaign. She argues this circumstantial evidence of the state of mind of Carville and Stephanopoulos, combined with the above evidence that

---

**2.** Stephanopoulos also stated in his deposition that he could not confirm the documents were Novak's notes and that Novak's notes were not a verbatim transcription of what Stephanopoulos said during the conversations. (Supplemental Decl. of Matthew Leish in Further Support of Defendants Stephanopoulos and Little Brown's Mot. for Summ. J., Ex. A at 83.) The reply briefs filed by Defendants argue the Court should not consider this document since it is hearsay and is not properly authenticated; however, whether the Court considers it or not, this evidence does not change the outcome of the case. Consequently, there is no need to resolve the issues of authenticity raised by the Defendants.

Stephanopoulos had contact with Pellicano, is sufficient to support a reasonable jury in finding Defendants disregarded obvious warning signs of falsity.

Even making all justifiable inferences in Flowers' favor and assuming a jury rejected the contradictory testimony of the Carville and Stephanopoulos and other deponents, the Court finds this additional evidence is still insufficient to support a verdict of malice under a clear and convincing standard. Flowers has offered evidence of Defendants' motives, but no evidence that Defendants knew of or disregarded obvious signs of falsity. She has evidence to support an inference that Stephanopoulos had contact with Pellicano, but no evidence to support her insinuation that Stephanopoulos influenced Pellicano to falsify his finding on KCBS. This does not rise to the clear and convincing standard.

Although Pellicano's importance to her case was apparent to Flowers early in the litigation,[3] she delayed deposing him until the very end of the extra ninety day of discovery accorded by the Court. When Magistrate Judge Leavitt granted an eleven day extension, Flowers again delayed, failing to send her subpoena until two days before the deadline. This delay resulted in a roomful of lawyers at a prison with no one to depose. Similarly, Flowers has not deposed Bill Novak, the writer who purportedly wrote the notes from *All to Human*, nor authenticated those pages in some other fashion. Finally, she has offered a hearsay assertion from Joyce Milton's book, but has not demonstrated there is any possibility she can convert that assertion into admissible evidence.

Consequently, there is no evidence the Clinton campaign employed Pellicano in any fashion. There is no evidence to controvert Stephanopoulos' assertion that any conversations between himself and Pellicano dealt exclusively with an analysis of the tape. There is no evidence Carville took part in the conversations or knew they had taken place. Finally, there is no evidence Stephanopoulos or Carville had any contact with CNN's expert, Steve Cain, or with KCBS or CNN. In sum, Flowers has not presented sufficient facts to support a conclusion by a reasonable jury that there was clear and convincing evidence that Defendants Stephanopoulos and Carville acted with knowledge of falsity or with reckless disregard.

### B. Intentional, Defamatory Discrepancies

■ As the Court has noted above, a defendant who republishes a statement made by a third party raises additional considerations. As *Pape* held, a defendant who publishes a rational interpretation of an ambiguous report has not acted with actual malice, even though he knows he has chosen one of several interpretations, even though his interpretation "arguably reflect[s] a misconception" *Pape,* 401 U.S. at 290, 91 S.Ct. 633. In *Masson,* the Court addressed the additional issue of malice in a defendant who republishes a statement made by a third party, knowing that what he says is not an accurate word for word transcription.

■ The question of falsity under the common law of libel concentrates on substance and "overlooks minor inaccuracies." *Masson,* 501 U.S. at 516, 111 S.Ct. 2419. Thus "[a] deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for pur-

---

**3.** *See Flowers v. Carville,* 310 F.3d 1118, 1131 (9th Cir.2002) (finding Flowers' claim that Pellicano was "a shill" for the Clintons could support a finding of malice if there was evidence to substantiate it).

poses of *New York Times Co. v. Sullivan* and *Gertz v. Robert Welch. Inc.*[, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)] unless the alteration results in a material change in the meaning conveyed by the statement." *Id.* at 517, 111 S.Ct. 2419 (citations omitted). A publication describing what someone has said cannot be libelous because it contains "minor inaccuracies" as long as " 'the substance, the gist, the sting' " of the statement is the same. *Id.* (quoting *Heuer v. Kee*, 15 Cal.App.2d 710, 59 P.2d 1063, 1064 (1936)).

Here, Flowers has also failed to present evidence that Defendants intentionally made statements that differed in a material and defamatory way from the CNN and KCBS news reports.

The news reports contain more ambiguities and qualifying language than Defendants' statements. The CNN report stated "somebody *may* have doctored the tapes," and added several other disclaimers, noting Flowers and the *Star* had denied any tampering and refused to release the original tapes. Additionally CNN stated its expert found "four breaks in the audio." KCBS never used the words "doctored" or "selectively edited," but instead stated Pellicano "found at least two altered edits that appear in one conversation between Clinton and Flowers, edits added to enhance Flowers' story."

In contrast, Carville's statement removes the qualifier and multiplies the number of suspicious breaks on the tape: "I think the [sic] found that tape was doctored and CNN even found out, like 10 or 12 different places ..." Stephanopoulos' statements also contain no qualifiers. On *Larry King Live* he said, "CNN and KCBS ... in 1992 showed that the tapes were doctored ..." In his other statements Stephanopoulos uses the phrase "selectively edited," but again fails to qualify his assertion.

However, under *Pape* and *Masson* these alterations do not prove Carville or Stephanopoulos intentionally omitted portions of the reports with knowledge or recklessness that their omissions would create a false impression as to what CNN and KCBS had actually said. Although CNN was careful to add information that weighed against its story, the "gist or sting" of the report was an assertion that the tapes were questionable and not to be trusted. The same is true for KCBS and for the story in the *Los Angeles Times*, which ran under the headline "Expert Says Clinton Phone Tape was 'Selectively Edited." ' (Defs. Stephanopoulos and Little Brown's Mot. for Summ. J. (Doc. # 183), Ex. L.) Because the difference in wording between Defendants' statements and the news reports did not create "a different effect in the mind of the [hearer] from that which the [original] would have produced," knowledge of the discrepancies does not rise to knowledge of falsity or reckless disregard. *Masson*, 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

Additionally, even if Carville and Stephanopoulos' omission of the qualifying language did constitute "a material change in the meaning conveyed" by the news reports, they have not acted with malice if their statements are "possible rational interpretation[s]" of an ambiguous document. *Pape*, 401 U.S. at 290, 91 S.Ct. 633. Even if the news reports qualified their assertion that Flowers' tapes were suspicious, they contained a number of statements supporting that conclusion. Thus, one possible interpretation of the reports is that CNN and KCBS said the tapes were doctored or selectively edited. The difference between Defendants' statements and the news reports they described do not constitute malice.

Because Flowers has not met her burden of proving that a reasonable jury could find by clear and convincing evidence that Defendants Carville, Stephanopoulos, and Little Brown acted with malice Defendants' motions for summary judgment on this issue must be granted. Because each count of Flowers' Complaint requires her to prove the element of malice this judgment is fatal to her Complaint.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion of Defendant James Carville for Summary Judgment (Doc. # 149) and Defendants George Stephanopoulos and Little, Brown & Company's Motion for Summary Judgment (Doc. # 183) are hereby GRANTED.

**IT IS FURTHER ORDERED** that Judgment shall enter in favor of Defendants James Carville, George Stephanopoulos and Little, Brown & Company and against Plaintiff Gennifer Flowers on the remaining claims in Plaintiff's Complaint.